[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-12866

_____

D.C. Docket No. 1:11-cv-01694-AT

ASKIA MUSTAFA RAHEEM,

Petitioner - Appellant,

versus

GDCP WARDEN,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 26, 2021)

Before JORDAN, ED CARNES and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this double homicide case, Askia Mustafa Raheem was convicted of

murdering Brandon Hollis and his mother, Miriam Hollis, and sentenced to death

by a Superior Court judge in Georgia.  He urges us to overturn his convictions and

the ensuing death sentence arguing, among other things, that he received

ineffective assistance of counsel at the sentencing phase of his trial because his

lawyers failed to investigate and present to the jury additional mitigating evidence

about his mental health and social history.  Alongside this claim, Raheem says the

state trial court violated procedural due process by failing to hold a hearing to

determine whether he was competent to stand trial.  Because this claim was never

raised in the trial court, he attempts to overcome his default by arguing that his

counsel were ineffective in not raising the claim.  He adds that regardless of the

failure to conduct a hearing, his substantive due process rights were violated

because he was in fact tried while incompetent.

Raheem also says that his due process rights were violated when he was

forced to wear a stun belt during trial, and when the prosecutor made

impermissible arguments about his future dangerousness.  Because these claims

were procedurally defaulted too, he argues again that his counsel were

prejudicially ineffective.  Finally, Raheem argues that the prosecutor improperly

mentioned his failure to testify at trial, denying him the privilege against self-

incrimination afforded by the Fifth Amendment.

The Georgia Supreme Court denied Raheem's Fifth Amendment claim on

direct review.  The state habeas court then denied on the merits Raheem's

ineffective-assistance-of-counsel claims and found that his claims about competency and being required to wear a stun belt were procedurally defaulted. The denial of these claims was neither contrary to nor an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts in light of the overwhelming evidence presented by the state. The district court reviewed for the first time Raheem's substantive due process claim. It did not clearly err when it found that Raheem was competent to stand trial. Accordingly, we affirm.

## I.

These are the essential facts and procedural history surrounding this § 2254 petition. In the afternoon of April 2, 1999, Raheem was driving his girlfriend Veronica Gibbs's blue Honda in and around Clayton County, Georgia, just south of Atlanta. He stopped to pick up his friends Michael Jenkins and Dione Feltus from their homes. Later, he dropped Feltus off at work at five o'clock in the afternoon. Raheem decided to go target shooting with Jenkins and another friend, Brandon Hollis, whom Jenkins had never met. Raheem and Jenkins drove to Gibbs's apartment, where Raheem was living, and retrieved a .380-caliber handgun from his bedroom. As this tragic story developed, Raheem then pulled to the side of the road and twice fired his weapon outside the window. Raheem claimed that he wanted to be sure the weapon would not jam.

On his way to pick up Brandon Hollis, Raheem stopped at a Kroger supermarket, where he purchased a box of black trash bags. Raheem and Jenkins picked up Brandon. They drove down a dirt road in Henry County, Georgia, some five minutes from Brandon's home, and they walked into the woods as it started to get dark. Raheem shot the firearm at a tree, but missed his target. Jenkins then took the weapon, intending to fire it. But Brandon suggested that they find another location because the gun was "loud." As Brandon turned and started to walk to the car, Raheem grabbed the firearm. Raheem instructed Brandon not to walk so quickly because he did not have a flashlight and Brandon might step in a puddle and get mud in his girlfriend's car. Jenkins looked down at his shoes to see if they were muddy. When he looked up, Raheem "had the gun at the back of Brandon's head, and he shot him." Brandon fell to the ground. Jenkins asked if Brandon Hollis was dead. Raheem responded, "No, but he is on his way out." Raheem stopped to take Brandon's watch, remarking, "I guess you ain't going to be needing this watch no more." He also stole Brandon's keys and his wallet. When Raheem and Jenkins returned to the car, Raheem told his friend, "I'm glad you didn't run."

Raheem and Jenkins proceeded to Brandon Hollis's home. Raheem used Brandon's keys to open the door. Before entering, Raheem told Jenkins to bring a trash bag into the house. When they walked in, Brandon's mother, Miriam Hollis,

4

was sitting in a chair reading a book. As Raheem entered brandishing the firearm, Miriam jumped up. Raheem fired at her and jumped behind a wall. Raheem yelled, "Get down, this is a robbery." As Miriam started to lie down on the floor on the other side of the chair, Raheem reached over the chair and shot her. Miriam Hollis fell, blood seeping out of her head onto the carpet. Jenkins handed the garbage bag to Raheem, who placed it over her head to contain the flow of the blood. After making sure no one else was in the house, Raheem grabbed the keys to Miriam's Lexus. Raheem explained that he killed Miriam Hollis because he had paid her $8,000 for the Lexus and she refused to give him the car. Raheem popped the trunk of the Lexus, and he and Jenkins placed Miriam's body inside. Raheem tried to clean the blood off the carpet with a mop.

Later, Raheem and Jenkins visited Raheem's girlfriend, Veronica Gibbs, at a B.P. gas station where she worked. Raheem brought Gibbs outside the station, popped the trunk of the Lexus, and showed her Miriam's body. Raheem and Jenkins then went to eat at a Wendy's, but Jenkins could not keep any food down. The two rode around in Miriam's Lexus until midnight and then picked up Gibbs from work. She, Raheem, and Jenkins drove back to the Hollis home in the Lexus. Gibbs and Raheem proceeded to burglarize the house.

At around 4 a.m., Raheem and Jenkins disposed of Miriam's body. They drove to some train tracks and took her body out of the trunk. Raheem dragged the

5

body along the tracks.  They covered Miriam Hollis with wood and debris.

Raheem said he wanted to burn the body, but Jenkins advised against it.

Nevertheless, Raheem doused Miriam's body with alcohol or gasoline -- Jenkins

was not sure which -- struck a match, and set the body ablaze.  The two of them

then drove back to Gibbs's house and went to sleep.  A few days later, Raheem

gave the firearm to a friend (Tamika Woods), asking her to hide it.  She threw the

weapon into a sewer, where it was later recovered by the police.

Raheem was indicted in Henry County, Georgia on two counts of malice

murder, four counts of felony murder (each of the murders were committed in the

course of an aggravated assault and both were committed with firearms while

Raheem was a felon in possession of a firearm), two counts of armed robbery, and

one count of burglary.  See Ga. Code Ann. §§ 16-5-1(a), (c), 16-7-1(a), 16-8-41(a)

(1999).  During the guilt phase of Raheem's trial, the state presented extensive

evidence of the brutal crimes, much of it from the testimony of Michael Jenkins.

Veronica Gibbs and Dione Feltus testified that Raheem had confessed to

murdering both Brandon and Miriam Hollis, and Gibbs confirmed that Raheem

had shown her Miriam's body in the trunk of the Lexus on the night of the

murders.

The prosecution also called a number of police officers, crime scene

investigators, and forensic analysts to corroborate the lay witnesses' accounts.

Among other things, the state presented evidence that Brandon and Miriam Hollis were both killed by gunshot wounds to their heads, that the firearm used in the crimes was the one Woods had dumped in the sewer, that a box and ammunition for the type of handgun used in the murders was found in Raheem's bedroom in Gibbs's apartment, and that DNA from Brandon and Miriam Hollis was found in blood on shoes known to be worn by Raheem. The state further introduced evidence that missing items from the Hollis home (including Miriam Hollis's checkbook) were found in Gibbs's apartment, that Miriam Hollis's stolen Lexus was found within walking distance of Gibbs's apartment, and that Miriam Hollis's burned body was discovered at the railroad tracks across the street from the home of Raheem's cousin.

In addition, the prosecution introduced a videotape of an interview conducted on April 6, 1999, between Raheem and the police. Raheem described substantially the same chain of events that Jenkins had recounted, but, notably, Raheem claimed that Jenkins was the shooter. Detective Renee Swanson testified that after Raheem made the videotaped statement, he took her to the location of Brandon's body in the woods. The jury convicted Raheem on all counts.

At the penalty phase, the prosecution called a number of jail officers who testified about various contraband items that had been found in Raheem's possession at the jail. The defense offered mental health experts Dr. Charles Nord

7

and Dr. Jack Farrar in mitigation.  Farrar had testified on Raheem's behalf at the guilt phase as well.  Raheem's father, Askia Raheem, and his mother, Elaine Raheem, also gave testimony on behalf of their son.  The jury unanimously recommended that Raheem be sentenced to die for the malice murder of Miriam Hollis.  On each remaining murder count, the jury recommended life in prison without parole.  The trial judge sentenced Raheem to death for the malice murder of Miriam Hollis, to life in prison for the remaining murder counts and the armed robbery counts, and to twenty years in prison for the burglary count, all sentences to run consecutively to one another.

Raheem directly appealed to the Georgia Supreme Court.  Georgia's high court affirmed his convictions and the ensuing sentences on March 11, 2002. Raheem v. State, 560 S.E.2d 680 (Ga.), cert. denied, Raheem v. Georgia, 537 U.S. 1021 (2002), reh'g denied, 537 U.S. 1150 (2003).[1]  Relevant for our purposes, the Georgia Supreme Court considered Raheem's claim that his Fifth Amendment right had been violated when the prosecutor commented, in closing argument, that Raheem had failed to testify at trial.  Id. at 685.  The Georgia Supreme Court concluded that although his constitutional right had been violated, the error was

_____

[1] The court noted that "[t]he trial court properly vacated the felony murder convictions [as duplicative] and imposed the jury's sentences for the malice murders."  Id. at 682 n.1 (citing Malcolm v. State, 434 S.E.2d 479, 482 (Ga. 1993); Ga. Code Ann. § 16–1–7(a)(1)).

8

harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967). Id.

Raheem first collaterally attacked his convictions in Butts County, Georgia. The state habeas court conducted an extensive evidentiary hearing in late January 2008. Raheem offered additional mental health evidence. First, Dr. Ruben Gur testified. Another defense expert, Dr. James Evans, presented an affidavit and the test results from his examination of Raheem. Additional affidavits were offered from other mental health experts who had consulted with the defense team before the trial: Dr. Jack Farrar (the primary mental health expert who aided the defense), Dr. Charles Nord, and Dr. Dennis Herendeen. Raheem's habeas counsel also presented a supplemental affidavit from Dr. Melissa Carran. In rebuttal, the state called its own mental health expert, Dr. Daniel Martell. The state habeas court took live testimony from Raheem's trial lawyers -- Gregory Futch and Wade Crumbley -- as well as from the state's chief investigator, Renee Swanson, and from the district attorney who prosecuted Raheem, Tommy Floyd. Finally, the court reviewed affidavits offered by Raheem's family members and friends.

On February 13, 2009, the Superior Court judge denied Raheem's petition, adopting nearly verbatim a 106-page proposed order submitted by the state. In relevant part, the state habeas court determined that defense counsel were not deficient in investigating or preparing for the guilt or penalty phases of his trial,

9

nor was Raheem prejudiced by counsel's performance.  The court found that trial counsel had "conducted a thorough investigation" into the available mitigation evidence and "developed a reasonable strategy of mitigation."  It concluded that "while there is some evidence [in the postconviction record] that Petitioner's brain does not function normally, contrary to Petitioner's assertions, there is not consensus as to what that actually means and what, if any, affect [sic] that has on Petitioner's behavior on the night of the crime, nor its influence on the decision of the jury."  The state court also rejected the claim that defense counsel were ineffective for not offering the additional theory that Raheem suffers from some kind of seizure disorder.  The court observed that multiple mental health experts did not discern any evidence of the disorder.  Nor was the proffered evidence conclusive.  Finally, the state habeas court rejected Raheem's claims about the use of a stun belt at trial, again finding no deficient performance nor any prejudice.

The Georgia Supreme Court summarily denied Raheem's application for a certificate of probable cause to appeal the denial of his habeas petition, and, on May 23, 2011, the Supreme Court denied his petition for writ of certiorari. Raheem v. Hall, 563 U.S. 1010 (2011).

The next day, Raheem turned his sights on the federal district court, filing this § 2254 petition in the United States District Court for the Northern District of Georgia, raising many of the same claims.  Applying the deference mandated by

10

the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. §

2254(d), the district court concluded that none of the state court's findings were

contrary to or an unreasonable application of clearly established Supreme Court

law, nor were they the product of unreasonable determinations of fact in light of

the evidence presented.

The district court reviewed de novo one remaining claim -- that Raheem was

not competent to stand trial.  First, the district court determined that Raheem was

not entitled to an evidentiary hearing on the claim, pursuant to 28 U.S.C.

§ 2254(e)(2).  Then, after examining all of the evidence placed in the record, it

concluded that Raheem was competent to stand trial.

The district court granted a certificate of appealability ("COA") on these

issues:

1. Ineffective assistance of counsel at the penalty phase of his capital
   trial by his counsel unreasonably failing to investigate and present
   evidence of Raheem's mitigating background and brain damage.

2. Violation of his Fifth Amendment privilege against self-
   incrimination when the prosecutor commented, during closing
   arguments, on Raheem's failure to testify.

3. Ineffective assistance of counsel in failing to object to the
   prosecutor's invoking his own expertise, injecting non-record
   evidence into the proceedings, and telling the jurors that petitioner
   would kill them if he was not sentenced to death.

4. Raheem was incompetent to stand trial, the trial court failed to hold
   a competency hearing, and counsel were prejudicially ineffective for
   failing to raise the claim at trial or on direct appeal.

11

5. Prosecutorial misconduct deprived Raheem of due process and a fair trial, specifically through the prosecutor presenting false testimony and withholding <u>Brady</u> evidence at the guilt and penalty phases.[2]

This Court granted in part a motion to expand the COA, adding one issue:

Whether the district court erred in denying Appellant's Sixth Amendment claim that his trial counsel unreasonably, prejudicially, and falsely showed and told the jurors that Petitioner was dangerous.

## II.

We review <u>de novo</u> a district court's denial of a habeas corpus petition. <u>McNair v. Campbell</u>, 416 F.3d 1291, 1297 (11th Cir. 2005).  Because Raheem filed his federal habeas petition after April 24, 1996, this case is governed by AEDPA.[3]  "Under AEDPA, if a state court has adjudicated the merits of a claim -- as the state court did here -- we cannot grant habeas relief unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'

---

[2] Although this claim was included in the COA, Raheem never argued it on appeal and, therefore, it has been abandoned.  <u>Isaacs v. Head</u>, 300 F.3d 1232, 1238 (11th Cir. 2002).

[3] As for Raheem's claim that AEDPA deference does not apply to the state habeas court order because the court ignored the evidence he presented, he is mistaken.  In the cases Raheem relies on, the courts began their analyses with AEDPA deference -- <u>not</u> de novo review -- and only later concluded that the state court had "unreasonably" ignored or discounted evidence.  <u>See</u> <u>Porter v. McCollum</u>, 558 U.S. 30, 42–44 (2009); <u>Guzman v. Sec'y, Dep't of Corr.</u>, 663 F.3d 1336, 1351–52 & 1347 n.13 (11th Cir. 2011); <u>see also</u> <u>Cooper v. Sec'y, Dep't of Corr.</u>, 646 F.3d 1328, 1353 (11th Cir. 2011) (noting that "we do not owe the state court's findings deference under AEDPA," and apply a <u>de novo</u> standard of review, <u>only</u> when we first find that "a state court unreasonably determines the facts relevant to a claim") (quotations omitted, emphasis added).  In this case, the state court did not unreasonably determine the facts.

or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Kilgore v. Sec'y, Fla. Dep't of Corr., 805 F.3d 1301, 1309 (11th Cir. 2015) (quoting 28 U.S.C. § 2254(d)).

"Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (alteration in original) (quoting Williams, 529 U.S. at 413).

The second prong of § 2254(d) -- that an adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding -- also "requires that we accord the state trial court substantial deference." Brumfield v. Cain, 576 U.S. 305, 314 (2015). "If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (alteration and ellipsis in original) (quoting Wood

13

v. Allen, 558 U.S. 290, 301 (2010)).  In addition, on AEDPA review, "a determination of a factual issue made by a State court shall be presumed to be correct" -- a presumption the petitioner has the burden of rebutting "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).[4]  "Clear and convincing evidence is a demanding but not insatiable standard, requiring proof that a claim is highly probable."  Nejad v. Att'y Gen., State of Ga., 830 F.3d 1280, 1289 (11th Cir. 2016) (quotations omitted).  "Highly probable is a standard that requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt."  Id. (quotations omitted, alteration adopted).

As for Raheem's substantive competency claim, we review the district court's factual findings for clear error, and its legal conclusions de novo.  See Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 481 (11th Cir. 2012) (setting forth the standard for a substantive competency claim raised on federal habeas and reviewed by the district court de novo, and noting that the petitioner "has not met that high burden, especially because he must show that the district court's finding that [petitioner] was competent was not just wrong, but clearly erroneous").  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction

---

[4] "The Supreme Court has not yet defined § 2254(d)(2)'s 'precise relationship' to § 2254(e)(1)," and we need not do so here.  Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016) (quoting Burt v. Titlow, 571 U.S. 12, 18 (2013)).

that a mistake has been committed." Jenkins v. Comm'r, Ala. Dep't of Corr., 963 F.3d 1248, 1264 (11th Cir. 2020) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

## III.

The main thrust of Raheem's arguments on appeal is that his trial attorneys were prejudicially ineffective by failing to further investigate and present to the jury evidence of his mental illness, cognitive deficits, and brain damage, and by failing to investigate and present evidence of additional mitigating family background and social history. The state habeas court disagreed. So do we. The state court's rejection of these claims was neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

To successfully show ineffective assistance of counsel, Raheem must establish that counsels' performance was constitutionally deficient -- that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" -- and that the deficient performance prejudiced the defendant, depriving him of a "fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). In other words, Raheem must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability

15

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 688, 694; accord Knowles v. Mirzayance, 556 U.S. 111, 124 (2009); Wiggins v. Smith, 539 U.S. 510, 521 (2003); Williams, 529 U.S. at 390; Darden v. Wainwright, 477 U.S. 168, 184 (1986). The failure to meet either Strickland prong is fatal to the claim. Strickland, 466 U.S. at 700.

As for the first prong -- counsel's performance -- "[j]udicial scrutiny . . . must be highly deferential." Id. at 689. We apply a "strong presumption" that counsel performed competently and ask only whether any "identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 689–90. And our review under AEDPA is doubly deferential: we extend deference both to the trial counsel's choices and to the state court's assessment of their reasonableness. Harrington v. Richter, 562 U.S. 86, 105 (2011). Harrington therefore affords "double deference to the state court ruling on counsel's performance." Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016). "The pivotal question is whether the state court's application of the Strickland standard was unreasonable[,]" which "is different from asking whether defense counsel's performance fell below Strickland's standard." Harrington, 562 U.S. at 101.

Indeed, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway

16

courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Just as Strickland allows for a range of strategic choices by trial counsel, so too is there considerable latitude for state courts to determine the reasonableness of those choices.  See Shinn v. Kayer, 141 S. Ct. 517, 523 (2020).  Accordingly, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington, 562 U.S. at 101 (quoting Yarborough, 541 U.S. at 664).  For Raheem to prevail, then, he would have to show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct.

In addition, it is well established that counsel's obligation to render competent performance includes "a duty to make reasonable investigations" of potential mitigating evidence "or to make a reasonable decision that makes particular investigations unnecessary."  Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 691).  In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id. at 521–22 (quoting Strickland, 466 U.S. at 691).  But counsel's duty to investigate "does not necessarily require counsel to investigate every evidentiary lead."  Williams v. Allen, 542 F.3d 1326, 1337 (11th Cir. 2008).  "Under

17

Strickland, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. (quotations and citations omitted); compare Strickland, 466 U.S. at 699 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), with Porter, 558 U.S. at 40 (noting that counsel "failed to uncover and present any evidence of [the petitioner's] mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment").

## A.

## 1.

We begin by painting a full picture of trial counsel's extensive investigation of the available mitigating evidence and the presentation of this evidence to the jury. Raheem's lawyers, Wade Crumbley and Gregory Futch, aided in the investigation by attorney Tom Carr, were experienced trial attorneys who each had some familiarity with death penalty cases. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc); see also Spaziano v. Singletary, 36 F.3d 1028, 1040 (11th Cir. 1994) ("[T]he more experienced an attorney is, the more likely it is that

18

his decision to rely on his own experience and judgment in rejecting a defense without substantial investigation was reasonable under the circumstances.") (quotations omitted).

Futch and Crumbley had each been practicing law for over fifteen years. Crumbley had worked on five death penalty cases and investigated or supervised investigations in each one, though he had never tried a death penalty case. He had also defended a number of non-capital murder trials, and had experience handling habeas cases. Futch had worked as an assistant district attorney and in private practice doing criminal defense, and had handled over one hundred felony trials, including "several murder cases," and "countless misdemeanors." Futch had also handled two death penalty cases -- one as a prosecutor and one as a defense attorney.

When defense counsel were appointed in July 1999, they quickly began investigating Raheem's background and mental health. Crumbley testified that he and Futch "tried to get all of the records we could from his educational past, his medical past, and his counseling past," in addition to his prison records; "[w]e got every kind of record we could think of." Crumbley added that he "tried to find every member of his family [he] could, to see if they were willing to cooperate." Crumbley also "tried to go back and . . . interview or at least talk to all of the

mental health professionals and counselors who had talked to [Raheem] in the past," and "[s]ome of those people became part of the defense team."

To learn about Raheem's family life, counsel met with Raheem's father, Askia, his mother, Elaine, his sister, Jameelah, his grandfather, and other family members on multiple occasions. Crumbley testified that Raheem's family "indicated willingness to do anything they could to try to help save him." Crumbley talked "at length" with Raheem's parents about "everywhere he'd been to school, everywhere he'd ever been to the doctor, everywhere he'd ever been for counseling." At one point a few months after an initial appointment, trial counsel spoke with Raheem's father Askia because they were concerned about Raheem's "apparent lack of concern." Askia said that he and Elaine had "always been concerned [and] tried to help him."

During their meetings, Askia told counsel about several troubling instances when Raheem was growing up. First, Askia recounted that when Raheem was in kindergarten, he left school and caught a bus that took him downtown. When he arrived downtown, he told people that he was from out of state and needed to get home. Counsel further learned from Askia that Raheem shot himself in the leg about three years before murdering Brandon and his mother. Raheem claimed that someone jumped him and shot him. Askia added that several times Raheem took a loaded nine-millimeter gun to school on the bus, carried the weapon around other

20

children, stole money from a safe and then came up with "tall tales."  Askia, Elaine, and Jameelah said that as a child, Raheem had injured his head on three occasions.  His family also reported that he had "always been strange," had "multiple personalities," and described him as "kindhearted but careless [and] heartless."  Raheem's paternal aunt offered that Raheem's behavior changed from a "respectful, loving child" to having "a love of guns [and] violence" when he was about twelve.  Family members also told counsel that he had attempted suicide three or four times.

Trial counsel generally were aware that Raheem's mother Elaine had been ill, and Raheem's medical records reported that Elaine had a "history of depression."  Counsel also knew that Raheem had attempted suicide after his mother's mental breakdown.  The defense lawyers further learned that Askia had resisted the treatments doctors recommended for Raheem when he was hospitalized following that suicide attempt.  Elaine explained that Askia had "faded out of the picture after the marriage broke down."

At the same time counsel were gathering information about Raheem's family life and upbringing, they also undertook an investigation into his mental health and medical history.  As early as October 1999 -- some fifteen months before trial -- counsel met with their first mental health expert, licensed psychologist Dr. Jack Farrar, who had treated Raheem after a suicide attempt at

21

age fifteen.  Before Raheem's trial, Farrar met with him "on many occasions" and told counsel that, based on these interactions, he "believed that there was some sort of abnormality with [Raheem's] brain."  Farrar recommended that defense counsel retain a neuropsychiatrist to do a full battery of neuropsychological testing.  Acting upon this recommendation, in April 2000, counsel sought and obtained funds from the trial court to retain Dr. Jeffrey Klopper, a neurologist and psychiatrist, whom Farrar described as an "ideal candidate" to conduct further investigation.  In August 2000, Klopper met with Raheem and evaluated him.

Around the same time, Dr. Dennis Herendeen, still another licensed psychologist retained by defense counsel, met with Raheem and administered several tests designed to reveal evidence of organic brain damage.  Dr. Herendeen used the Kaufman Short Neuropsychological Assessment Procedure ("K-SNAP"), which tests five or six areas of brain function; an Aphasia Screening Test, which "looks for impairment in language" -- namely, the "ability to understand what people are saying" and express oneself through language and writing; and the Trail Making Test, Parts A and B.  In addition, defense counsel contacted yet another licensed psychologist, Dr. Charles Nord, who had performed tests on Raheem's brain functioning when he was fifteen years old at Charter Peachford Hospital.  They asked Nord to "express an opinion" about whether these tests suggested

22

neurological damage.  Herendeen and Nord both conducted the Bender-Gestalt test, which assesses cognitive development and screens for brain damage.

After the testing and evaluations were completed, about two months before trial, defense counsel spoke with Drs. Klopper and Farrar, who informed them that Klopper and Herendeen had not found evidence that Raheem suffered from brain damage.  Rather, the doctors suggested that, in order to look further for evidence of brain damage, Raheem should take a magnetic resonance imaging ("MRI") scan and then a positron emission tomography ("PET") scan.  Counsel's contemporaneous notes indicated that an MRI was needed to "check for possible brain lessions [sic]," which could cause Raheem's impulsivity and could affect "the ability to distinguish between right [and] wrong."  These notes also mentioned the possibility of a bipolar disorder diagnosis and the possible need for a quantitative electroencephalogram ("EEG"), though there is no testimony that this test was ever recommended.  Klopper admitted to counsel that it was unlikely the MRI and PET scan would show anything further, but counsel "thought [they] needed to do it anyway and not rely solely on that."

Defense counsel again sought funds from the trial court and scheduled an MRI and a PET scan.  At the collateral hearing, counsel told the judge that they were looking for evidence of organic brain damage: "[Dr. Klopper] and Dr. Farrar have consulted and the feeling is that there is a need to have a diagnostic test done,

23

which is referred to as a PET scan . . . of Mr. Raheem's brain, to determine whether there is any evidence of brain damage or of impaired functions of certain parts of the brain which might be attributable to head trauma in his past and which might in some way have a causal link with some of the psychiatric problems that he's experienced."

The MRI was performed on January 19, 2001, at Henry Medical Center. The interpreting physician concluded his report with the overall impression that Raheem had a "normal brain MRI with no evidence of acute intracranial injury." Thereafter, Dr. Klopper ordered the PET scan to be conducted at Emory Hospital, noting on the order forms that the "[p]atient has history of major depression, suicide attempts, and delusional thought processes.  History also indicates childhood head trauma.  Rule out functional abnormality."  The PET scan was scheduled at Emory for 11:30 a.m. on February 6, 2001, during voir dire.  That day, however, Raheem refused to get out of the transport at Emory to have the PET scan done.  Crumbley unequivocally testified at the state postconviction hearing that aside from the PET scan, there were no "evaluations or tests that the mental health experts told [counsel] needed to be done that [counsel] did not do."

By the time of trial, all four of defense counsel's mental health experts had performed testing, Raheem had undergone an MRI, and the experts had analyzed the results of the tests.  All four experts and their testing and reports indicated that

24

the doctors had nothing helpful to offer the defense about organic brain damage. At that point, according to Crumbley, the defense team chose to forego Klopper's testimony because he would have testified that he found no evidence of organic brain damage and because he was "very skeptical" that the MRI or PET scan would have revealed anything. Counsel did, however, call Drs. Farrar and Nord to testify on Raheem's behalf.

During the guilt phase of the trial, defense counsel called Dr. Farrar, who testified extensively about Raheem's serious mental illnesses -- including major depressive disorder, multiple suicide attempts, borderline personality disorder, and narcissistic and antisocial features -- largely in support of a theory that Raheem had falsely confessed to the crimes due to his mental health problems.[5] Farrar told the jury he first met Raheem at Fairview Day Hospital in August 1994 after Raheem had attempted suicide at age fifteen and had been released from Dr. Nord's care at Charter Peachford Hospital. Dr. Farrar described Raheem's program at Fairview as "a very intense outpatient hospital program," that Raheem attended instead of school. Farrar summarized the psychological tests he had performed in 1994, and noted that Dr. Nord had administered similar tests around that time.

---

[5] When asked to clarify at trial the relevance of Farrar's testimony to the guilt phase, Crumbley explained that "[t]he theory of relevance of this testimony is purely that there has been evidence presented that [Raheem] made statements to various people about his involvement in these crimes. And we think that it is relevant on the issue of whether the jury ought to believe that or not. And that is our sole theory of relevance here."

Dr. Farrar retested Raheem about five years later, after his arrest for the murders, and found that the results were "extremely parallel, almost identical over time" and the "personality problems were almost exactly the same." Farrar described Raheem as "a young man that is very, very depressed," and who exhibits "a great deal of suspiciousness and paranoia," including "hypervigilance." Farrar added that individuals like Raheem with borderline personality disorder sometimes "push themselves away" from others, and when they do so, "they get real angry and sometimes real verbally hostile or get the other person to be verbally hostile with them."

According to Farrar, Raheem's personality disorder also led him to tell stories, including his involvement in committing crimes. Farrar told the jury that Raheem "is so depressed, so much dislikes himself, that he attempts to get people to take him on, to beat him up," by exhibiting a "real false bravado." Farrar said:

> He puts out this persona, or this kind of image of himself, that he wants people to buy that is supposed to be scary, that is supposed to be frightening. And he tries to make people back off. And so he tries to control situations by being outlandish, by developing these crazy, often times frightening stories and often times admitting to crimes which I don't believe he has conducted or he has done to feel bigger than he is.

When asked by Raheem's counsel whether it was plausible that Raheem would falsely admit to his girlfriend that he had committed a murder that he did not in fact commit, Farrar responded, "Oh, absolutely. That is part of his modus operandi, yes. Exactly." Finally, Raheem's counsel asked whether there was a delusional

26

component to Raheem's mental illness, which Farrar confirmed: Raheem "has a whole world that sounds delusional [if] you listen to it. He calls it the place that he goes to."

During the penalty phase of Raheem's trial, defense counsel called both Drs. Nord and Farrar. Dr. Nord, who had treated Raheem at Charter Peachford Hospital after his 1994 suicide attempt, had diagnosed Raheem with major depression and oppositional defiance disorder. Nord's impression of Raheem at fifteen was of a deeply troubled young man: "[Raheem] is a young man at risk. He's depressed, continues to have suicidal ideation, gets disorganized easily and is quite impulsive. At times he doesn't care what happens to him. He will continue to be at risk until one gets control of his depression, agitation, and suicidal ideation."

Nord testified that he evaluated Raheem again in January 2001, in preparation for trial. Nord told the jury that Raheem's mental illness had worsened since 1994; he was still depressed, but by 2001 he showed "borderline personality characteristics, because he would dissociate, he would go into himself." He was "more distant and distractible," and would "zone out and move into another world, which he had control of." Nord explained that "borderline" means "he's on the verge of becoming more psychotic [meaning he hallucinates], but he's still within some range of reason." Raheem felt he could "disappear into that world," which he found comforting.

27

On cross-examination, Nord agreed that Raheem's other world was like a "daydream" or a "fantasy world," and that most people in jail charged with crimes are depressed. The state pressed Nord on his oppositional defiance disorder diagnosis, asking, "That's pretty self-descriptive, isn't it? He's defiant of authority?" Nord replied, "Yes. He had a lot of issues with authority." When Nord told the prosecutor he had not observed vindictiveness in Raheem, the prosecutor asked if Nord was aware that Raheem had threatened to kick a jailer in the "rear end" and had threatened to kill the prosecutor and his own girlfriend for their roles in the trial.

The defense recalled Dr. Farrar at the sentencing phase. Farrar testified that he'd been deeply frustrated when the managed care company stopped paying for Raheem's treatment at Fairview Day Hospital back in 1994, and he even insisted that the clinic start treating Raheem for free, because Raheem was still suicidal and had "severe problems" the clinic could address. Nevertheless, Raheem's treatment was curtailed and the clinic discharged him. Farrar told the jury that Raheem wanted to die, that he "just doesn't want to live, hasn't wanted to live for a very long time." Farrar opined that if Raheem could have stayed at the center for further treatment, "we would have gotten this young man well." Farrar added that although Raheem played the "tough guy," he had a softer side, a concern for other people, and an ability to attach to people.

28

The defense also called Raheem's father, Askia, and his mother, Elaine, to testify at the sentencing phase. Notably, Raheem initially had barred counsel from putting his parents on the stand. And Raheem never allowed counsel to call his sister. According to Raheem's counsel, Raheem "put some restrictions on me as to who I could call and what I could ask at the sentencing phase," and "limited me severely in what I was able to present." Only after "a lot of begging" and persuading members of the press not to film Raheem's relatives did Raheem agree to let Crumbley call his parents to testify.

While on the stand, Askia expressed how sad he was about the crimes his son committed, adding that he loved his son and did not want him to die. He agreed with Dr. Farrar that Raheem wanted to die and said that although he had "given a lot of thought about this," he did not know why. He relayed that he and his wife had been separated for about three years. When prompted by counsel to "tell the [j]ury something good about" Raheem, Askia recounted a time when he had a cat and Raheem fought him "harder than anything" about keeping the cat in the garage rather than outside. He also said that Raheem could not stand to see him hit a squirrel in the road. He testified, "I can't remember him talking back to me. That's the truth. . . . I don't ever remember him having an act of violence against anybody."

29

Askia also described the incident when five- or six-year-old Raheem had boarded a city bus instead of going home from school, and how a bus driver had informed Askia that they were holding a boy at the transit center who claimed to have caught a bus from out of state. It was at that time that Askia first noticed "something wasn't quite right" with his son. On cross-examination, the prosecutor brought out that Askia had lived in the home with Elaine during "most of [Raheem's] life," but Askia noted that Raheem left home when he was about fifteen or sixteen and Askia "sort of lost track of him" after that.

Raheem's mother Elaine testified next. During her testimony, she became emotional, which prompted Raheem to yell at her in an attempt to get her to step down. When Elaine regained her composure, she testified that the crimes were extremely unlike Raheem, that he had always been well-mannered to her, had never raised a hand against her, and had never used profanity. She said that Raheem had helped her whenever she was sick, cooking for her and driving her. When he was a child, he had always been "very loving, very loving, even more loving than my daughter was." Elaine was shocked that Raheem would have committed the crimes he was charged with. After Elaine finished testifying, Crumbley asked all of Raheem's family members in the courtroom to stand up so the jury could see them.

In closing argument at the penalty phase, Raheem's counsel expressly argued that the unrebutted testimony of Drs. Nord and Farrar established that Raheem was mentally ill and that the jury should consider this as a mitigating factor. Counsel conceded that Raheem was not incompetent or insane, but said he was "not as blameworthy as a normal person who was not mentally ill, who had committed these same crimes. Sometimes his thinking is delusional and confused. Sometimes he believes things that aren't real. And a lot of times he hates himself so much that he wants to die." Counsel noted that Raheem had never gotten the mental help he needed because his insurance would not cover it. Counsel urged that Raheem had "good in him," was "capable of concern for others," and could potentially get the medical help he needed in prison. Finally, counsel pleaded with the jury to sentence Raheem to life in prison without the possibility of parole rather than to death.

## 2.

At the state postconviction hearing, Raheem's counsel presented newly obtained evidence of mental illness in order to challenge his trial counsel's performance. The strongest opinion testimony came from Dr. Ruben Gur, a neuropsychologist and professor at the University of Pennsylvania, who testified in part based on a battery of neurophysical tests he conducted. He also reviewed the testing done by Drs. Farrar, Herendeen, and Nord, as well as MRI data collected by

a radiologist in 2006, and neuropsychological testing performed by another defense expert, Dr. James Evans, in 2005.

Analyzing the MRI data, Dr. Gur opined that Raheem's temporal lobe exhibited severe abnormality.  His left hippocampus was between two and two-and-a-half standard deviations smaller than normal, and his amygdala was between three and four standard deviations smaller than normal.  His whole frontal lobe was "reduced in volume."  Notably, however, this MRI data had produced a normal initial reading.  Only in later analysis of the MRI did Gur uncover evidence of brain damage, contrary to the reading he'd done using the visual image produced by the MRI.  Gur explained that this could happen with MRI images of diffuse brain abnormalities.  Gur opined that Raheem's brain deficits could have affected his culpability for the crimes and his competence at trial because they impaired his "ability to correctly perceive events, interpret events, exercise suitable judgment, and to plan and respond appropriately."  He also concluded that "Raheem suffers from schizophrenia or schizophrenic-like psychosis, which results in distorted perceptions of reality and renders him incapable of interpreting and responding appropriately to the world around him."

Another expert, Dr. Evans, performed postconviction neuropsychological testing on Raheem and submitted an affidavit agreeing that Raheem suffers from brain damage.  Evans opined that the neuropsychological testing he performed in

May 2005 showed "clear indications of brain damage/dysfunction," that his testing was "indicative of rather widespread cortical dysfunction, probably greatest in temporal areas."

Drs. Herendeen and Nord also offered postconviction affidavits, in which they claimed that their pretrial and 1994 results were "consistent" with a finding of organic brain damage. Herendeen noted: "When screening tests produce results consistent with organic brain damage, usually a full neuropsychological battery is then administered by a neuropsychologist, not a psychologist." Yet Herendeen did not say he recommended further testing to Raheem's counsel before trial. Indeed, defense counsel's notes from a December 4, 2000 meeting indicate that Herendeen had gone to see Raheem the day before "according to [Farrar]" and that "[Farrar] didn't think that [Herendeen] found anything to help [the defense]." As for Nord, he claimed in his postconviction affidavit that his 1994 tests were consistent with brain damage, but he never mentioned brain damage at Raheem's trial, where he admittedly "testified regarding [his] impressions" of Raheem. Rather, Dr. Nord's trial testimony reflected his opinion that Raheem was depressed and showed characteristics of borderline personality disorder. Moreover, Nord's 1994 psychological report does not make any mention of brain damage.

The state's mental health expert, Dr. Daniel Martell, agreed that there was some evidence of organic brain damage, opining that "the impairment that he does

33

have appears to be mild to moderate and specific to [several] focal areas . . . : the tapping deficit, particularly with his right hand, implicating the left motor strip, the mathematic learning disability and the possibility of an attention deficit disorder." Martell nevertheless concluded that Raheem's organic brain abnormality did not affect his behavior or his functioning in any of the ways that Gur had posited. Martell admitted that Raheem's deficits in temporal lobe functioning would "be of interest" to a jury considering how to sentence Raheem -- and that had he been on the defense team and seen Dr. Gur's testing, he would have told them to present it in mitigation. But Dr. Martell also said that he did not see any evidence that Raheem was "unable to control his behavior," or that he lacked the ability to understand the world around him, or, finally, that he had impaired executive functioning (i.e., problems with decision making and judgment). In his report, also submitted as an exhibit at the state habeas hearing, Martell concluded, "Raheem does not suffer from significant brain damage, and he is neither psychotic nor delusional."

Beyond the issue of organic brain damage, the petition offered evidence, discovered for the first time postconviction, that Raheem suffers from a seizure disorder, which causes brief "absence seizures." Dr. Martell noted that they were ten to thirty seconds in duration. Martell added that Raheem's sister and father's affidavits in the postconviction record describing periods when Raheem would be

34

"conscious but unresponsive" as a child "suggest[ed] to [him] that this may be a longstanding disorder."

Dr. Martell explained that when Raheem came out of one of these periods, he was extremely self-conscious, was "aware that he had been gone," and "would make up stories to cover it up." This behavior suggested to Martell an epileptic phenomenon. Martell explained that if Raheem was having one of these absences at the time of trial, he could "zon[e] out for 30 seconds at a time," and although Martell "d[idn]'t see that as particularly disabling," he conceded that "it's certainly conceivable that he could zone out at a moment when there's critical testimony and miss that testimony." When habeas counsel told Martell that Raheem had experienced two fainting episodes while in jail, Martell testified that this behavior is "quite consistent with a seizure disorder."

However, Dr. Martell squarely said that Raheem was competent to stand trial: "I think he was competent then, and I think he's probably competent now." What's more, Martell testified that even if Raheem had absence seizures, this would not have affected his responsibility for his crimes. Martell "doubt[ed]" that Raheem could shoot someone during one of these seizures, because he was unfocused during the seizures, "which would be inconsistent with focusing, aiming, and shooting a gun at some distance," and a seizure lasting for ten hours would be "rare."

35

Dr. Gur also reviewed Raheem's videotaped interview with Martell and concluded that it evidenced a "seizure disorder." When asked why he had not arrived at this diagnosis himself, he replied, "Well, I didn't spend a lot of time with him. I only spent about three or four hours, and most of this time was taken up by testing. And if he had those absences during my interview I have to admit, embarrassingly, that I didn't notice them." He then noted that "these are not easily picked up and there are also days when they don't happen." Gur added that Raheem exhibited psychosis, characterized by flat and inappropriate affect as well as a delusional belief in the existence of parallel universes. However, during the habeas hearing, Dr. Gur expressly said he was not diagnosing Raheem with epilepsy or as having absence seizures.

Dr. Gur gave conflicting testimony about whether these absences might have affected Raheem's competency to stand trial. Gur agreed with counsel that if Raheem had an absence seizure during the trial, his mind would be "literally absent": he would not be able to hear the proceedings in the courtroom; he would "not be able to respond," and someone could shake him and he would not know. Gur said that Raheem's "jocular behavior during the trial, his inappropriate affect and his refusal to acknowledge that there is anything wrong with him mentally" could interfere with the ability of his attorneys to defend him. When the state habeas court asked Gur for anything specific that led him to conclude that Raheem

36

was incompetent, Gur responded: "I think mostly his lack of contact with reality, his confabulations, memory distortions, his mannerisms. I think when you put them together it puts [an] obstacle in the relationship between the lawyer and the client." But Gur acknowledged that he did not talk to Raheem's trial counsel about their communications with Raheem. Further, Gur admitted that Raheem was able to participate in tests and gave valid test results, working with many doctors. Gur added that Raheem understood him and his role, and that Raheem was able to communicate with Gur and was "apparently oriented to time, place, and person."

As for whether the absence seizures could have affected Raheem's behavior during the commission of the crimes, Gur acknowledged that having epilepsy would not directly cause someone to kill people. Indeed, that would be "ridiculous," but "[h]aving epilepsy can be a condition where under certain circumstances [it] can contribute to behavior of the kind that can end up killing people." Asked whether a seizure could last for as long as ten hours, Gur responded that "there is a situation called status epilepticus that can last for several hours," although what he saw in a videotape of Raheem were thirty-second to two-minute "staring spells."

When the state habeas judge directly asked Gur whether it was his position that "either or both of these murders was caused by a seizure," Gur testified that he did not know, and that Raheem would need to be evaluated by an epileptologist to

37

see if he has epilepsy.  Finally, Gur concluded that generally, Raheem knew right from wrong.

Raheem also submitted an affidavit from Dr. Melissa Carran, a neurologist and epileptologist.  Carran reviewed the record and diagnosed Raheem with epilepsy, noting that while she could not precisely identify the type of seizures Raheem suffers from, his presentation in the videos she watched was "consistent with a person suffering from either absence seizures, or brief complex partial seizures."  However, Dr. Carran did not meet with Raheem and did not conduct electrophysiology, which Dr. Gur testified was necessary to diagnose an individual with epilepsy.

Attorneys Futch and Crumbley both agreed in their postconviction testimony that they saw some evidence of Raheem's absence seizures -- though they did not identify them as that at the time -- during their representation of Raheem at trial. Crumbley testified that "there were times when he was not responsive.  There were times when he, you know, avoided my efforts to engage with him in a conversation."  However, Crumbley made clear that he "never saw anything that seemed, that suggested any sort of psychiatric abnormality, or anything of that nature."  By contrast, attorney Futch testified that he had in fact observed the behavior now described as absence seizures.  Futch noted that when Raheem

38

would "drift off," counsel would "get him back on task and then he could become communicative" again.  Futch elaborated:

> In our many meetings and interactions with each other, he would, for lack of a better way to explain it, like, go off somewhere else in his mind.  We'd have to bring him back to where we were.  Where he went, what he was thinking about, I have no clue but he was hard to focus, hard to pin down on things that obviously would be helpful to his defense team, to try to investigate.  And just in the personal interactions with him, it was apparent that he, I thought there was something wrong with him.

But Futch also testified that Raheem's behavior generally was "appropriate during the trial."

In addition, both attorneys testified that they were never told that Raheem was incompetent.  Futch said:

> I can't for the life of me think that, you know, Wade Crumbley and myself, who defended countless defendants in cases, would not have taken our only expert at the time telling us he's not competent and not have some kind of hearing on that. . . . I mean, we're just the lawyers, and we had the Court appoint an expert to help us in that regard, and we're going to take his or her opinions as they come.

Futch was clear that "my opinion would be that he was competent to stand trial, otherwise, I would have . . . fought very vigorously to have his trial postponed." Crumbley agreed: "I didn't have any mental health expert telling me that [Raheem] was insane or that he was incompetent . . . .  No one ever suggested to me that [Raheem] was not competent.  My own impression was that he was competent."

**B.**

39

On this record, Raheem argues that his trial counsel were ineffective for failing to further investigate and present to the jury evidence of his mental illness, cognitive deficits, brain damage, and seizure disorder. The state habeas court rejected this claim, finding that counsel "reasonably investigated [Raheem's] mental health" and were not deficient in their presentation of mitigating evidence during the guilt and sentencing phases of Raheem's trial. These decisions were not based on unreasonable determinations of the facts in light of the evidence presented, nor were they contrary to or an unreasonable application of clearly established federal law.

As we've detailed, Raheem's counsel conducted an extensive investigation into his mental health before trial, and offered a fulsome presentation of mitigating evidence at trial. Counsel consulted with <u>four</u> different mental health experts, seeking and obtaining funds from the trial court for evaluations and tests on multiple occasions. Each expert administered testing and provided their findings to counsel, and Crumbley and Futch followed up on each suggestion from these experts.

The record further reflects counsel's and Dr. Farrar's particularly active roles in investigating and evaluating Raheem's mental health. Farrar testified that even though he had tested and treated Raheem when he was younger, in the year before trial, on average, he met with Raheem at the jail about "once every three

40

weeks." After Raheem was arrested, Farrar not only administered more tests and met with Raheem "multiple times," but also met members of Raheem's family "several times." Crumbley likewise testified that counsel spoke with Farrar often: he said he met with Farrar "at least ten or 12 and . . . maybe more, like, 20 or 30" times.

Then, two doctors -- Farrar <u>and</u> Nord -- ultimately testified in detail at Raheem's trial, offering not only an explanation for his admissions, but also providing the jury with ample mitigating evidence of his troubled mental health, including major depressive disorder, multiple suicide attempts, borderline personality disorder, and narcissistic and antisocial features. Further, over Raheem's initial objection, trial counsel succeeded in calling Raheem's mother and father as well. They described his unusual behavior as a child and pleaded with the jury to spare his life. Raheem's counsel ended their arguments highlighting his mental illnesses and the possibility of rehabilitation in prison. They also rebutted the prosecutor's claim of future dangerousness, and finally, offered a residual doubt theory.[6]

---

[6] As for the argument Raheem raises in his reply brief to this Court -- challenging, for the first time, counsel's residual doubt strategy -- we decline to consider it. "As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." <u>Herring v. Sec'y, Dep't of Corr.</u>, 397 F.3d 1338, 1342 (11th Cir. 2005) (quotations omitted, alteration adopted).

Raheem nonetheless claims that the mental health investigation undertaken by counsel was "too little and too late." Importantly, however, he agrees that the investigation proceeded along this timeline: soon after counsel were appointed, they quickly began investigating Raheem's background and mental health, meeting with Raheem's family and Dr. Farrar. Trial counsel sought funds from the court and officially hired Farrar more than a year before trial. And on Farrar's recommendation, Drs. Klopper and Herendeen were hired by counsel, and then, upon the experts' further recommendations, imaging tests were promptly scheduled.[7] The record reflects nothing but speed and diligence from trial counsel, and Raheem has given us nothing to suggest otherwise.

Raheem similarly disputes the state habeas court's determination that "[t]rial counsel followed up on each suggestion from the mental health professionals," since Farrar told counsel that "a full battery of neuropsychological testing was needed." But trial counsel unequivocally testified that there were no tests specifically suggested -- with the exception of the PET scan that Raheem refused to take -- that weren't conducted. See Darling v. Sec'y, Dep't of Corr., 619 F.3d 1279, 1284 (11th Cir. 2010) ("Nor could a reasonable jurist debate the conclusion

---

[7] The MRI took place several weeks before trial, and the PET scan that Raheem ultimately refused to take was scheduled during voir dire. During a pretrial conference, Crumbley explained that he had diligently tried to schedule the PET scan earlier, but that Emory was simply unable to accommodate them at any earlier date.

that [the defendant's] attorneys were entitled to rely on the psychological evaluation performed by [their expert], which did not recommend that [the defendant] be further evaluated for brain damage.").   To the contrary, counsel diligently pursued each test and recommendation.  When Farrar suggested that neuropsychological testing was needed, defense counsel hired Drs. Klopper and Herendeen to conduct further tests.  Klopper and Farrar then suggested in a December 2000 meeting -- after Klopper and Herendeen had both examined Raheem and found nothing "real clear" or helpful -- that an MRI and a PET scan might help.  Again, counsel pursued this advice, scheduling both procedures.  As the record reveals, counsel followed up at every turn.

As for the failure to ask for a continuance when Raheem refused to take the PET scan, it's notable that Raheem never submitted to a PET scan in postconviction.  It's hard to find that this was so critical a test that no reasonable attorney would have failed to seek a continuance in order to reschedule it, when in all the years since Raheem's convictions, his attorneys apparently never had him take a PET scan.

Raheem also blames trial counsel for failing to investigate and present evidence of a seizure disorder.  The record reveals, however, that trial counsel actually introduced some evidence of the absence seizures at trial, when Drs. Farrar and Nord "appeared to correlate the 'absences' to [Raheem's] fantasy

43

world."  Nord expressly testified that as part of Raheem's mental illness, he would "zone out and move into another world, which he had control of," and that "he's on the verge of becoming psychotic [meaning he hallucinates], but he's still within some range of reason."  Farrar too described Raheem's fantasy world at trial.

As we see it, trial counsel did not disregard evidence of the seizure disorder, but instead, presented the evidence about Raheem's absences known to them at the time of trial -- after consulting with <u>four</u> experts, none of whom diagnosed Raheem with a seizure disorder.  As for Dr. Martell's opinion at the habeas hearing that the absence seizures were different from Raheem's fantasy world, Martell clarified that he was unsure, and that Raheem was "a very unusual case that the medical center would love to have lots of doctors do a grand rounds about."  Even Dr. Gur admitted he did not arrive at the seizure disorder diagnosis himself despite spending some time with Raheem.  He added that if Raheem suffers from this disorder, it would be hard even for an expert to spot it.  In light of the difficulties Raheem's experts had in noticing his absence seizures, we cannot fault the state habeas court for finding that Raheem's trial counsel were not deficient to the extent that they too were unaware of the absence seizures.

Indeed, as the state court found, "Dr. Martell merely presented a theory of 'absence seizures' possibly linked with epilepsy," but "there is no conclusive evidence" that Raheem actually suffers from a seizure disorder, namely epilepsy.

This is consistent with the record.  Dr. Martell said that Raheem's behavior merely "raised the possibility" that Raheem had absence seizures and noted that additional testing would be necessary to determine this conclusively.  And although Dr. Carran was an epileptologist who diagnosed Raheem with epilepsy, she did not conduct electrophysiology tests or even meet with Raheem, and none of the other experts diagnosed Raheem with epilepsy.  On this record, Raheem has not met his burden of rebutting the state court's factual determinations "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Nor can we say that the state habeas court's conclusions concerning counsel's investigation into or presentation of Raheem's possible epileptic disorder -- or other mental health issues, for that matter -- were based on an unreasonable determination of the facts in light of the evidence presented, nor were they contrary to or an unreasonable application of clearly established federal law.

## C.

Raheem also takes issue with counsel's investigation into and presentation of his background and social history at trial.  The state habeas court found that "trial counsel conducted a thorough mitigation investigation," including "obtain[ing] all of Petitioner's school, medical, mental health, court and juvenile records that were in existence," "attempt[ing] to locate all of Petitioner's family members to see if they would be cooperative," and "tr[ying] to interview all of the

45

mental health professionals and counselors who had previously treated Petitioner." The court concluded that Raheem failed to establish that his counsel's investigation into mitigating background evidence and the presentation of that evidence during sentencing was deficient or that he was prejudiced. We cannot say that the state court's determination on this score was contrary to or an unreasonable application of federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

As the record reflects, counsel's investigation into Raheem's background and social history was substantial. Counsel met with Raheem's parents and sister on multiple occasions and other family members at least once, and Crumbley testified that Raheem's family was cooperative and wanted to help counsel. Crumbley talked "at length" with Raheem's parents about "everywhere he'd been to school, everywhere he'd ever been to the doctor, everywhere he'd ever been for counseling." This investigation was thorough -- counsel attempted to get all of Raheem's available school, medical, and prison records, testifying that "[w]e got every kind of record we could think of."

Raheem claims, nevertheless, that the investigation raised red flags, counsel did not follow up, and if counsel had done so, they would have discovered evidence of a troubled childhood. They would have offered evidence that his

46

father Askia was "militaristic, brutal, and abusive," and that he beat Raheem.  They would have also maintained that Raheem's home environment was a hostile one.

In support of this claim, Raheem relies on his family's postconviction affidavits, including a statement from Raheem's father that he whipped Raheem, and a statement from his sister that their father "beat [Raheem] often, even for little things."  In addition, Raheem points to Crumbley's testimony that while Raheem's father was "a very nice man, very articulate, very well-mannered," he was also "guarded" and "seemed to be a very proud person."  Crumbley said that because of this, he "wondered whether if there was some terrible secret in the family whether he would tell it or let anybody tell it."

Raheem argues that there was in fact something else there and counsel should have looked further.  But Crumbley's account makes clear that he and Futch did look, and were disappointed to learn that there was not as much mitigating evidence as they hoped to find.  See Gissendaner v. Seaboldt, 735 F.3d 1311, 1329–30 (11th Cir. 2013); Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999).

Moreover, the information that defense counsel did elicit contradicts much of the new abuse allegations contained in the postconviction affidavits.  Crumbley testified during postconviction proceedings that none of Raheem's family members ever indicated to him that Raheem's father was abusive to him.  Raheem's records

47

from Charter Peachford Hospital also note that Raheem "denie[d] a history of physical or sexual abuse." The hospital records even report that Raheem's mother relayed that Raheem had "a friend in his father," and that the two had a "special relationship"; their disciplinary methods (a realm "mostly" reserved for Raheem's father) included taking away privileges and talking with Raheem. And while his mother denied any physical abuse of Raheem, she noted that Raheem had made verbal threats to his sister. Similarly, records drawn from Raheem's stay at Baldwin State Prison revealed that Raheem denied ever having experienced any sexual or physical abuse. In fact, he described having "a good relationship with his parents." Raheem has given us nothing to suggest that trial counsel had any reason to be on alert of the physical abuse he now claims he suffered.

Furthermore, if counsel had elicited this new information in mitigation, they might have strategically chosen not to present it because it would have been powerfully contradicted at trial. What's more, much of it is cumulative to what was uncovered during counsel's investigation and presented at the penalty phase. See Darling, 619 F.3d at 1284 ("No reasonable jurist could debate the holding that the fact that [the petitioner] now has gathered additional evidence about his background that differs in some minor respects from the evidence actually presented at trial does not render his attorneys' performance deficient and certainly

48

does not render the decision of the [state supreme court] objectively unreasonable.").

As we've noted, counsel knew that Raheem had exhibited troubling behavior from a young age, that people close to him noticed these things, that he had experienced head injuries as a child, and that he had attempted suicide on several occasions. They also knew that Raheem's parents' marriage had broken down, that Raheem had attempted suicide after his mother's mental breakdown, and that Raheem's father resisted putting Raheem on any medication after his suicide attempt. Counsel sought all of Raheem's school, medical, and court records as well. And then, at trial, counsel presented a full overview of the evidence gathered, including testimony about his parents' marriage, his father's belief that "something wasn't quite right" with Raheem from a young age, and Farrar and Nord's opinions on Raheem's suicide attempt, further suicidal ideation, and his delusional behavior. Farrar described Raheem's "family history of depression," noting that Raheem's mother "had chronic depression for years." He also told the jury that the apparent cause of Raheem's "acting out" and first suicide attempt was his mother's breakdown and depression.

We also cannot ignore that Raheem placed limits on the witnesses counsel could call in mitigation and the information counsel could elicit from them. Only after "a lot of begging" and persuading members of the press not to film Raheem's

49

relatives on the witness stand did Raheem agree to let Crumbley call his parents to the stand.  And Raheem never allowed Crumbley to call his sister.  Raheem also interrupted and tried to "cut short" his mother's testimony when she became emotional.  Raheem yelled in court, "get off the stand."  She continued to testify.  Crumbley later explained that this interruption "probably worked in his favor," because he thought "it suggested to the jury at least that he had concern for some other person."

Because of the limits Raheem placed on his counsel's ability to call witnesses in mitigation, it was not unreasonable for the state court to conclude that counsel was not deficient for not calling more members of Raheem's family to testify.  This is especially true since Raheem's counsel did thoroughly investigate and present substantial mitigating evidence, including the testimony of mental health experts Drs. Farrar and Nord.  Moreover, counsel even persuaded Raheem to permit them to call his parents to the stand during the penalty phase of trial.  See Krawczuk v. Sec'y, Fla. Dep't of Corr., 873 F.3d 1273, 1293–94 (11th Cir. 2017) ("When a competent defendant clearly instructs counsel either not to investigate or not to present any mitigating evidence, . . . 'the duty to investigate does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area of defense and to obtain a court order in defiance of his wishes.'") (citations and quotations omitted); Blankenship v. Hall, 542 F.3d 1253,

50

1277 (11th Cir. 2008) ("Significant deference is owed to failures to investigate made under a client's specific instructions not to involve his family."); Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) ("We have also emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance under the Sixth Amendment.").

Based on all of the evidence we have seen, we conclude that the state court's determination that counsel were not deficient in their mitigation investigation or presentation was not an unreasonable determination of the facts in light of the evidence presented, nor was it contrary to or an unreasonable application of clearly established federal law.

**D.**

In any event, even if Raheem could show that his counsel were somehow deficient, the state court's determination that Raheem suffered no prejudice on account of any of the alleged deficiencies in counsel's performance was neither contrary to nor an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  To show prejudice, "it must be established that, but for counsel's unprofessional performance, there is a reasonable probability the result of the proceeding would have been different."  Putman v. Head, 268 F.3d 1223, 1248 (11th Cir. 2001).  "'It is not enough for the [petitioner] to show the errors had some

51

conceivable effect on the outcome of the proceeding . . . ,' because '[v]irtually every act or omission of counsel would meet that test.'" Id. (quoting Strickland, 466 U.S. at 693) (alterations and ellipses in original). Simple mistakes or strategic errors are not enough, nor are serious errors if, absent those errors, there is no "reasonable probability" that the outcome would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The Supreme Court has explained:

> Strickland asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

Harrington, 562 U.S. at 111–12 (citations omitted).

"In the capital sentencing context, the prejudice inquiry asks whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 522–23 (quoting Strickland, 466 U.S. at 695). Thus, "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534 (emphasis added). We examine all of the good and all of the bad, what was presented during the trial and what was offered later, collaterally. The question is whether, "viewed as a whole

52

and cumulative of mitigation evidence presented originally," there is "'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." Williams, 529 U.S. at 399.

In determining whether a reasonable probability of a different outcome exists, we presume a reasonable decisionmaker. See Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("[I]n judging prejudice and the likelihood of a different outcome, 'a defendant has no entitlement to the luck of a lawless decisionmaker.'" (alteration adopted) (quoting Strickland, 466 U.S. at 695)). Additionally, "[w]hen a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" Shinn, 141 S. Ct. at 520 (quoting Harrington, 562 U.S. at 103).

We start with what is indisputable: the evidence in aggravation was very substantial. First, the brutality of the crimes was thoroughly explicated at trial. Raheem committed a cold-blooded double homicide, first shooting his friend Brandon Hollis in the back of the head for no apparent reason and then telling Jenkins that he was not dead "but he is on his way out." After shooting Brandon, Raheem took his keys and wallet and he and Jenkins went to the Hollis home,

where Raheem used Brandon's keys to go inside. Once in the home, Raheem twice shot at Brandon's mother Miriam Hollis, who had been sitting in a chair reading a book, killing her with the second shot. Raheem placed a garbage bag he had purchased earlier over Miriam's head to contain her blood as it seeped onto the carpet. He then stole Miriam's car keys, stuffed her body in the trunk of her vehicle, and took her car. Hours later, Raheem returned to Miriam's house -- her body still in the trunk of the car -- with his girlfriend and Jenkins, and they burglarized Miriam's house. Raheem desecrated Miriam's body, first parading it around in the trunk of the car for hours and showing it off, and then dousing her body with gasoline or alcohol and burning it on train tracks.

Indeed, six statutory aggravators were argued to the jury, and all of them were found beyond a reasonable doubt, including that: (1) the murder of Brandon Hollis was committed while in the commission of the armed robbery of Brandon Hollis; (2) the murder of Brandon Hollis was committed for the purpose of receiving things of monetary value; (3) the murder of Miriam Hollis was committed during the course of another capital felony, the murder of Brandon Hollis; (4) the murder of Miriam Hollis was committed in the course of a burglary; (5) the murder of Miriam Hollis was committed during the armed robbery of Miriam Hollis; and (6) the murder of Miriam Hollis was committed for the purpose of receiving things of value. Ga. Code Ann. §§ 17-10-30(b)(2), (4).

54

In addition, during the penalty phase, the prosecution presented substantial evidence of future dangerousness. The state introduced court records showing that Raheem carried a weapon on school property when he was fifteen and stole an automobile and fled from police when he was seventeen.

The prosecutor also called a number of jail officers who testified about contraband that had been found in Raheem's cell. First, an officer testified that officials found a "large shank" and razor blade that were "stuck to the frame of his bed," as well as another shank in the smoke detector. The officer explained that a shank is a sharpened "homemade tool," and said that the larger one -- at least a foot long -- was one of the largest that she had ever seen as an officer. Another officer testified that during a separate search of the cell, officials found hidden under a bunk a chair leg that had been ripped off. A third officer testified that he also found a detailed map of the jail in Raheem's cell, with Raheem's name on it, as well as a sock filled with rocks and a golf ball.

A fourth officer testified that he spoke with Raheem about the murders and Raheem said he "had to do what [he] had to do. It was just business." This officer "asked if [Raheem] ever thought about anything that happened or if he could go back and change anything," and Raheem "said no." On another occasion, Raheem threatened the officer, telling him he knew who he was, and saying, "I also know you're a witness in my case, you little snitch. . . . I'll kill you." Raheem told the

55

officer that he knew the officer had pepper spray, and if he sprayed Raheem with it, Raheem would kill him. The officer further testified that Raheem "practically ran the [cell] block."

Finally, the prosecution called a jail inmate, who testified that Raheem told him that Raheem planned to kill his girlfriend, "because she was testifying against him," and that he also planned to kill the prosecuting district attorney -- Tommy Floyd -- saying that "Tommy Floyd didn't know who he was messing with."

Not only did the jury hear extensive aggravating evidence about the murders and about Raheem's future dangerousness, Raheem's attorneys, as we've detailed, presented substantial evidence about his mental health in mitigation. See supra discussion at 26-32 (summarizing testimony from Dr. Farrar, Dr. Nord and Raheem's parents about Raheem's borderline personality disorder, his depression, his oppositional defiance disorder, his impulsivity and hostility towards others, and his suicide attempts).

"[N]o prejudice can result from the exclusion of cumulative evidence." Dallas v. Warden, 964 F.3d 1285, 1310 (11th Cir. 2020) (quotations omitted). "Mitigating evidence in postconviction proceedings is cumulative when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." Id. at 1308 (quotations omitted). The Supreme Court has found evidence cumulative where it

56

"substantiate[s]," "support[s]," or "explain[s]" more general testimony provided at trial. Cullen v. Pinholster, 563 U.S. 170, 200–01 (2011). Here, much of the additional mitigation evidence about Raheem's brain damage and seizure disorder would have only "substantiate[d]," "support[ed]," or "explain[ed]" more general testimony offered at trial, and therefore would have been at least somewhat cumulative. Id.

As for the remaining new evidence about Raheem's brain damage, psychosis, and seizure disorder, we cannot ignore the circumstances surrounding the crimes he committed, which would have undermined the probative value of this additional evidence. The state habeas court explained that the "cognitive deficits" and "organic brain impairment" Raheem pointed to showed that he "may act impulsive, use poor judgment and had trouble with decision-making." But, it found, "[e]ven viewing [Raheem's] proposed evidence in its most 'mitigating' light, . . . there is no reasonable probability that the jury or the courts would have rendered a different determination had it been presented. The crimes were horrific and cold-blooded, showing calculation, planning and execution over a 10-hour period."

The state court's decision was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. It is supported by the evidence

57

showing that Raheem had "extensive opportunities to consider his actions": after Raheem picked up the gun from Gibbs's apartment, he pulled to the side of the road and twice shot out of the window, telling Jenkins he wanted to make sure it would not jam; on the way to pick up Brandon Hollis, Raheem, with obvious forethought, stopped at Kroger and bought a box of trash bags; after shooting Brandon, Raheem took his keys and wallet, and used the keys to open the front door of Brandon's house; he told Jenkins to bring in a trash bag before they entered Brandon's house, and used it to contain the blood after he shot Miriam Hollis in the head; he attempted to mop up the blood that seeped onto the carpet; Raheem and Jenkins went to dispose of Miriam's body many hours later after keeping her body in the trunk of her Lexus and showing it off to Raheem's girlfriend; Raheem instructed a friend to hide the murder weapon; and when questioned by the police after the double homicide, he claimed that Jenkins was the shooter. Shinn, 141 S. Ct. at 525.

At virtually every stage of this ten-hour crime spree, Raheem attempted to conceal and disguise the crimes he had committed. On this record, the state court did not unreasonably weigh the potential brain damage evidence against the full slate of aggravating evidence introduced. See Franks v. GDCP Warden, 975 F.3d 1165, 1183 (11th Cir. 2020) (noting that the petitioner's background and "facts of the case powerfully undercut the equivocal expert testimony about [the

58

petitioner's] cognitive deficits -- specifically that he suffered from impaired executive functioning").

And even assuming that Raheem did have absence seizures, this would not explain his crimes. Dr. Martell "doubt[ed]" that Raheem would shoot someone during one of these seizures, because he was unfocused during them, "which would be inconsistent with focusing, aiming, and shooting a gun at some distance," and a seizure lasting ten hours would be "rare." Even Dr. Gur admitted he did not know if either murder was caused by a seizure, noting that Raheem would need to be evaluated for epilepsy by an epileptologist, and he thought that Raheem generally knew right from wrong. Thus, the state court's prejudice rationale is not "so obviously wrong" as to be "beyond any possibility for fairminded disagreement." Shinn, 141 S. Ct. at 526 (quotations omitted).

What's more, the experts' postconviction testimony about Raheem's mental health would have been substantially undermined by Martell's other testimony. Dr. Martell testified that Raheem did not have "significant" brain damage, the brain damage did not impact his executive functioning, and Martell was unconvinced that his cognitive defects "caused him to be unable to control himself when he did the things he did." His report concluded that Raheem was "neither psychotic nor delusional."

We've previously found that petitioners were not prejudiced where the expert mental health testimony was equivocal.  See Dallas, 964 F.3d at 1310 ("Introducing the ADHD diagnosis would have opened the door to [an expert's] testimony that [the petitioner] was of 'average intelligence' -- testimony that would have been harmful to [the petitioner] since it would have undermined [the other expert's ADHD] assessment."); Franks, 975 F.3d at 1182–83 (finding no prejudice where "the expert testimony was far more equivocal" than other cases where "the evidence was unequivocal and powerfully contextualized otherwise inexplicable crimes").  "Indeed, both the Supreme Court and this Court have consistently rejected the prejudice argument where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence."  Dallas, 964 F.3d at 1310–11 (quoting Ponticelli v. Sec'y, Fla. Dep't of Corr., 690 F.3d 1271, 1296 (11th Cir. 2012)) (quotations omitted, alterations adopted).  In light of the conflicting expert opinions offered, a reasonable jury easily could have rejected Raheem's evidence about brain damage, or more importantly, any suggestion that brain damage somehow contributed to or explained the double homicide and the other crimes. See Darling, 619 F.3d at 1285.

As for new evidence about Raheem's social history or background, what came out in Raheem's postconviction proceedings comes nowhere near the extreme abuse and deprivation elicited in cases where the Supreme Court has

found prejudice as a result of counsel's failure to offer mitigating evidence. The additional evidence about his background was largely that his parents were unwilling or unable to help in his mental health treatment, and the allegation that Raheem's father was physically abusive to him.

But in cases where the Supreme Court has found prejudice, "the disparity between what was presented at trial and what was offered collaterally was vast. In other words, the balance between the aggravating and mitigating evidence at trial and in postconviction proceedings shifted enormously, so much so as to have profoundly altered each of the defendants' sentencing profiles." Dallas, 964 F.3d at 1312. The allegations Raheem has presented collaterally, while disturbing, do not paint a picture of abuse like that in those cases and would not have "profoundly altered" Raheem's profile at the penalty phase. See, e.g., Wiggins, 539 U.S. at 535 (trial counsel introduced no evidence about the "severe privation and abuse in the first six years of [the petitioner's] life while in the custody of his alcoholic, absentee mother," and later "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care").

The testimony concerning Raheem's father's claimed abuse would have been undermined by contradictory information available to counsel at the time of trial, including Crumbley's testimony that none of Raheem's family members ever indicated to him that Raheem's father was abusive to him; Raheem's records from

61

Charter Peachford Hospital indicating that Raheem and his mother denied a history of physical abuse; and Raheem's Baldwin State Prison records indicating that he denied suffering from any sexual or physical abuse, and reported having "a good relationship with his parents."

What we are left with is the powerful aggravating evidence and substantial mitigating evidence actually presented at trial, weighed against the additional mitigating, though substantially cumulative evidence about mental health, along with some evidence about brain damage, and arguably contradictory evidence of childhood abuse. We cannot conclude, on this record, that it was contrary to or an unreasonable application of Strickland for the state habeas court to find no prejudice. As we've said, it is not enough for Raheem to convince this Court that we would review this body of evidence differently under a de novo Strickland review; rather, he is required to establish that the state habeas court's weighing was unreasonable. This he cannot do.

## IV.

We are similarly unpersuaded by Raheem's procedural and substantive claims of incompetency to stand trial.

First, he says the state trial court violated his procedural due process rights under Pate v. Robinson, 383 U.S. 375 (1966), by failing to sua sponte hold a competency hearing. Because Raheem did not raise this claim on direct review,

62

the claim is procedurally defaulted.  See James v. Singletary, 957 F.2d 1562, 1572 (11th Cir. 1992) ("Pate claims can and must be raised on direct appeal.").  When "a state court determines that a claim was defaulted on procedural grounds," we review it on the merits only when a petitioner shows that cause and prejudice exist for the default or a "fundamental miscarriage of justice -- i.e., that a constitutional violation has resulted in the conviction of someone who is actually innocent." Ledford v. Warden, Ga. Diagnostic Prison, 975 F.3d 1145, 1160–61 (11th Cir. 2020) (quotations omitted).  Raheem does not invoke the fundamental-miscarriage-of-justice exception; instead, he argues he can overcome his default by showing cause and prejudice -- in this case, by demonstrating that his counsel were ineffective in failing to raise his procedural due process claim.  See id. (noting that ineffective assistance of counsel may constitute cause to overcome a procedural default).  Second, Raheem says that regardless of the failure of the state court to hold a hearing, his substantive due process rights were violated because he was in fact tried while incompetent.  The state habeas court did not address this question, and we review the district court's ruling on this issue for clear error.  See Lawrence, 700 F.3d at 477.

Applying Strickland, the state habeas court concluded that there was no deficiency of counsel and no prejudice in failing to ask for a competency hearing, and, therefore, that Raheem could not overcome the procedural default of his Pate

63

claim. Because "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim," to succeed now, Raheem must overcome the double deference of AEDPA review of the performance prong of Strickland claims. Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (emphases in original). That is, he must show that it was objectively unreasonable for his attorneys to fail to raise the claim -- by failing to ask for a hearing -- and that reasonable jurists could not disagree on that question.

Raheem first argues that his counsel were ineffective for failing to seek a competency hearing because, according to Farrar's postconviction affidavit, he told counsel around the time of trial that Raheem was incompetent. The state habeas court made a factual finding, however, that Farrar did not do so. Both attorneys testified unequivocally that they did not recall Farrar telling them Raheem was incompetent and that if they had been told, they would have investigated it or asked for a continuance and a hearing. The state court credited the testimony of Futch and Crumbley and discounted Farrar's testimony.

The record lends support to the state court's treatment of this claim. At an April 2000 pretrial hearing on a motion requesting additional funds, the defense called Dr. Farrar. Dr. Farrar told the trial court that he recommended that Raheem be put on certain psychiatric medications. Trial counsel noted that "obviously, Mr.

64

Raheem . . . would have to agree to do that. I mean, he is mentally competent, is he not, to make his own decision about that?" Farrar unequivocally responded, "Yes, sir, he is." We recognize that competency concerning medical decisions is not quite the same thing as competency to stand trial. But this testimony is surely probative of what Farrar believed at the time, when Raheem was preparing for trial, and suggests that Farrar did not believe that Raheem was incompetent to stand trial.

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011). Furthermore, "[w]e consider questions about the credibility and demeanor of a witness to be questions of fact." Id. Applying the AEDPA presumption of correctness to the state habeas court's factual determination that Farrar's testimony was less credible than the attorneys', we cannot find that Raheem has rebutted the presumption by clear and convincing evidence. See id.; 28 U.S.C. § 2254(e)(1). This is especially true since Farrar's testimony appears to have been inconsistent over time.

The state habeas court made further factual determinations supporting the conclusion that counsel were not ineffective for failing to seek a competency hearing, none of which were unreasonable. The state court credited defense counsel's testimony that no mental health expert -- neither Farrar nor anyone else -

65

- told them that Raheem was incompetent, and they believed Raheem to be competent. It also credited Dr. Martell's testimony at the habeas hearing that Raheem's erratic behavior before and during trial was not indicative of incompetency. Raheem has not rebutted these credibility determinations by clear and convincing evidence. Accordingly, it was not contrary to or an unreasonable application of Strickland to conclude, as the state habeas court did, that there was no prejudicially ineffective assistance of counsel to overcome the procedural default of Raheem's Pate claim.

Raheem also argues that his substantive due process rights were violated because he was in fact incompetent to stand trial. This is a separate question from whether the trial court erred by not sua sponte holding a competency hearing, and the parties agree that a substantive incompetency claim like Raheem's cannot be procedurally defaulted. See Lawrence, 700 F.3d at 481 (adhering to "both pre– and post-AEDPA precedent . . . holding that substantive competency claims generally cannot be procedurally defaulted"). The substantive test for competency is whether a defendant has, at the time of trial, "sufficient . . . ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). A petitioner raising this kind of claim bears the burden of demonstrating his incompetency at the time of trial by a

66

preponderance of the evidence. See James, 957 F.2d at 1571. Because the state habeas court did not make a ruling on this claim, the federal district court reviewed it de novo.

In so doing, the district court considered all the evidence in the record about Raheem's competency and found that Raheem had not established by a preponderance of the evidence that he was incompetent. The court further held that Raheem did not establish by clear and convincing evidence that he was entitled to an evidentiary hearing on the claim in federal court. The district court summarized its findings this way:

> Based on its review of the record, the Court assumes, arguendo, that [Raheem] did suffer brief absence seizures at the trial. But the Court also bears in mind the narrow test of competency to stand trial -- whether the petitioner "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "whether he has a rational as well as a factual understanding of the proceedings against him." Dusky, 362 U.S. at 402. Given the narrowness of the competency standard, and the totality of the evidence presented in this case, this Court concludes that [Raheem] has not demonstrated his incompetence at the time of trial by a preponderance of the evidence, nor has he established by "clear and convincing evidence" that creates a "real, substantial, and legitimate doubt" as to his competence that he is entitled to an evidentiary hearing. Lawrence, 700 F.3d at 481. Cf. Humphrey v. Walker, [] 757 S.E.2d 68 (2014).

We review the factual finding made by the district court for clear error. See Lawrence, 700 F.3d at 477. There was no clear error. First, Raheem's lawyers spent a significant amount of time with Raheem and both believed him to be competent at the time of trial. Crumbley said, "[m]y own impression was that he

67

was competent"; Futch confirmed, "he was competent to stand trial."  The contemporaneous assessment of trial counsel is particularly probative because competency is "primarily a function of defendant's role in assisting counsel in conducting the defense" and the defendant's counsel is thus "in the best position to determine whether the defendant's competency is suspect."  Watts v. Singletary, 87 F.3d 1282, 1288 (11th Cir. 1996).

Moreover, of the many mental health experts who evaluated Raheem's condition at the time of trial, only Farrar opined that he was incompetent, and Farrar did not say so at trial, but rather only years later, in a postconviction affidavit.  In any event, as we've noted, Farrar's testimony is not particularly compelling since he admitted before trial that Raheem was competent at least to make decisions about his medication.  Further, Dr. Martell affirmatively asserted that Raheem was competent.  As for Dr. Gur's postconviction testimony on the issue of competency, Gur opined that Raheem's behavior during trial could have interfered with the ability of his attorneys to defend him, but he conceded that he did not speak with Raheem's trial counsel about their communications with Raheem.  Gur also testified that Raheem was cooperative and successfully completed the neuropsychological testing and evaluations.  Raheem has failed to show how the district court's ruling constituted clear error.

68

As for Raheem's claim that his absence seizures rendered him incompetent, the district court assumed, arguendo, that Raheem suffered these seizures at trial, but found that his absence seizures were "brief," and that they did not establish his incompetency by a preponderance of the evidence taking the record as a whole. This included evidence that Raheem was able to assist his counsel and participate in the proceedings. Futch testified that "for the most part, [Raheem] was appropriate during the trial."

The trial court also conducted colloquies of its own with Raheem before trial -- for example, during pretrial hearings, Raheem told the court he had no objections to defense counsel or the way in which they were conducting his defense, and Raheem explained to the court that he refused to get out of the transport to take the PET scan because of the attention that he would receive, telling the court he didn't want to be placed on display. As the state habeas court concluded, when ruling on the procedural due process claim, there was "nothing in these colloquies that indicates Petitioner was incompetent at trial." Additionally, during the sentencing phase, Raheem ultimately agreed to allow counsel to call his parents.

Raheem also points to Dr. Carran's affidavit as evidence of incompetence. Carran said that seizures "likely affect Mr. Raheem's ability to both assist his attorneys and understand the proceedings against him," and "necessarily effect

69

[sic] his ability to follow narrative, to respond appropriately, and to understand fully what is taking place." The district court assumed for its analysis, however, that Raheem <u>did</u> suffer absence seizures at his trial, even noting that the record "supports his contention that he suffers from absence seizures of brief duration." The district court therefore considered Carran's opinion, but after reviewing the "totality of the evidence," it concluded that Raheem was competent.

Undoubtedly, Raheem did not act in his own best interests at all times, including when he refused to get out of the car for the scheduled PET scan and when he told his mother to "get off the stand." But the test for competency is not whether he always acted in his own best interests; rather, it is whether he had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." <u>Dusky</u>, 362 U.S. at 402 (quotations omitted). The district court rightly described the competency standard as a "narrow" one. And our review is only for clear error. See <u>Lawrence</u>, 700 F.3d at 477. We can discern none.

## V.

Raheem's next claim alleges violations of the Due Process Clause. He says his rights were violated when he was required to wear a stun belt at trial, which unfairly communicated to the jury that he was extremely dangerous and, to overcome his default of that claim at trial and on direct review, he argues that his

70

attorneys were prejudicially ineffective for failing to protect him from that unfair inference. See Ledford, 975 F.3d at 1160–61; Black v. Hardin, 336 S.E.2d 754, 755 (Ga. 1985) (finding that Georgia state law provides that "a failure to make timely objection to any alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus," unless the petitioner shows cause and prejudice) (emphasis in original). The state habeas court found no deficiency of counsel and found no prejudice as well.

As for Raheem's claim that defense counsel unconstitutionally allowed him "to be restrained with shackles and/or a stun belt throughout trial," the record clearly reflects that a hidden stun belt, and not shackles, was used. And under our caselaw, Raheem's counsel could not have been ineffective for allowing Raheem's restraint with a stun belt because that measure did not violate his due process rights.

We addressed a similar claim that a petitioner's constitutional rights were violated when the state trial court required him to "wear a stun belt under his clothes during the resentencing trial without holding a new evidentiary hearing to determine whether the restraint was necessary" in Nance v. Warden, Georgia Diagnostic Prison, 922 F.3d 1298, 1303 (11th Cir. 2019), cert. denied sub nom. Nance v. Ford, 140 S. Ct. 2520 (2020). We explained in Nance that the Georgia Supreme Court's decision could not have been contrary to or an unreasonable

71

application of clearly established law because no Supreme Court case was on point: "[t]he Supreme Court has never addressed whether and under what circumstances a trial court may require a defendant to wear a stun belt." Id. at 1304.  Commenting on the same three Supreme Court decisions Raheem relies on here, we noted that they "all involve visible security restraints and the unique constitutional problems they present -- namely, the impact that they have on the jury's perception of the defendant and the public's perception of the judicial process."  Id. (emphasis in original); see Deck v. Missouri, 544 U.S. 622, 630–33 (2005); Holbrook v. Flynn, 475 U.S. 560, 569 (1986); Illinois v. Allen, 397 U.S. 337, 343–44 (1970).  "[V]isibility of the security measure at issue was central to the reasoning of all three of those decisions, and the Court limited its holdings accordingly."  Nance, 922 F.3d at 1304.  In Deck, for example, the Supreme Court held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest -- such as the interest in courtroom security -- specific to the defendant on trial."  544 U.S. at 624 (quotations omitted, emphasis omitted).

In finding that Raheem's stun belt was not visible to the jury, the state habeas court quoted from the Georgia Supreme Court decision in Nance, defining a stun belt: "[u]nlike shackles, it is worn under the prisoner's clothes and is not visible to the jury."  See Nance v. State, 623 S.E.2d 470, 473 (Ga. 2005).  This

72

definition, the state habeas court found, conformed with Crumbley's testimony that

the stun belt was a "battery pack thing that he wore, that was <u>under his clothing</u>,"

(emphasis added).  We accept this factual determination.  Raheem has not rebutted

it.  Therefore, the trial court could not have violated Raheem's due process rights

by requiring him to wear a security measure that was not visible to the jury.  Nor

was it contrary to or an unreasonable application of <u>Strickland</u>, nor based on an

unreasonable determination of the facts, for the state court to have concluded that

Raheem's counsel were not ineffective for failing to raise a stun belt due process

claim.

The state habeas court's decision also was consonant with <u>Deck</u> when it

found that the use of the stun belt was proper under the circumstances of Raheem's

case.  In <u>Deck</u>, the Supreme Court provided an exception to its holding concerning

visible shackles -- when the trial court determines, "in the exercise of its

discretion," that a state interest specific to the particular trial justifies the shackles.

544 U.S. at 629.  This determination may "take into account the factors that courts

have traditionally relied on in gauging potential security problems and the risk of

escape at trial."  <u>Id.</u>  The state habeas court made this connection in Raheem's

case:

> The record establishes that [Raheem] has been charged with the violent
> murder of Miriam and Brandon Hollis.  In addition, the State elicited
> testimony during the sentencing phase of trial that jailers had searched
> [Raheem's] jail cell and found a shank, razor blade and a detailed map

73

of the jail that was to be used in an escape attempt.  Furthermore, the State presented evidence that [Raheem] had threatened to kill one of the jailers at the Henry County Sheriff's Office.

The use of the stun belt was tied to the particular circumstances of Raheem's case.

Raheem argues in the alternative that even if the stun belt was not visible, the jury became aware of it through two other prejudicially ineffective errors by his counsel.  First, Raheem claims that counsel were ineffective for failing to warn him not to stand when he stood up during his mother's testimony at the penalty phase, the stun belt began to beep, and he turned to a guard and said, "go ahead and shock me."  Raheem also says that Crumbley himself ineffectively and prejudicially told the jurors about the stun belt in his closing argument at sentencing.  Each argument was addressed by the state habeas court, which found neither deficient performance nor prejudice for either alleged error.  Unlike the due process claim, Strickland requires finding both ineffectiveness and prejudice.

First, Raheem says the jurors became aware of the stun belt when his mother took the stand during the penalty phase.  Her testimony began with "Mustafa is my baby," she became emotional, and Raheem stood up and said, "get off the stand." At that point, because he stood, the stun belt was activated and began to beep.  The state habeas court noted, however, that the trial transcript did not reflect that Raheem said "[g]o ahead and shock me" and there was no evidence to support a finding that the jurors actually heard the stun belt being activated or Raheem's

74

alleged comment. Raheem has not rebutted the presumption of correctness as to those factual findings -- the trial transcript does not reflect the comment, which by itself suggests it was not audible enough for the court reporter, or possibly the jurors to hear it. Raheem's counsel was sitting right next to him, so just because he heard the comment does not mean everyone in the courtroom heard it. With those unrebutted findings, the state habeas court's decision was not based on an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established law.

Raheem next claims that Crumbley performed ineffectively when he made these closing remarks at sentencing:

> You need to understand that [Raheem] is not a threat any longer. The Sheriff has had him locked up for almost two years. He is in chains, or wearing an electric shock belt, as he is today, everywhere he goes. He has talked some, but he hasn't done a single violent thing since he has been in jail. He is headed for the state prison system, into maximum security, into a setting which is far more sophisticated and severe in its security measures than the Henry County jail. It is not at all likely that he'll ever hurt anyone else in that setting. There's no reason any longer to be afraid of him and there's no reason to kill him. Killing him will just demean us.

Raheem says that telling the jurors he was wearing a stun belt was prejudicially ineffective because it was like telling the jurors that he is dangerous. But the state court concluded that this closing argument "was not unreasonable in light of counsel's theory of no future dangerousness."

75

As we've described, the prosecution relied heavily on future dangerousness in its sentencing phase presentation. It called prison officials who described death threats Raheem had made and the discovery of weapons and an escape plan in his cell. In response, defense counsel argued that Raheem was <u>not</u> actually a danger, nor would he be one, because the security measures surrounding him were comprehensive and tight. Raheem has not established that counsel's strategy was an unreasonable one. Ultimately, the state court's findings were neither contrary to nor an unreasonable application of clearly established Supreme Court law.

The state habeas court also concluded that counsel's remark was not prejudicial, finding "no reasonable probability that had trial counsel not referenced the stun belt in closing argument the result of Petitioner's sentencing would have been different." We agree. We already have detailed the powerful evidence surrounding these brutal murders. Beyond that, because the state had relied so heavily on evidence of future dangerousness, counsel's comment about the stun belt plainly was aimed at communicating to the jury that adequate security measures were in place and they had no reason to fear him. This determination was not contrary to or an unreasonable application of clearly established Supreme Court law.

**VI.**

Raheem also raises several claims of prosecutorial misconduct.  His first one attacks comments the prosecutor made to the jury during closing arguments at sentencing.  As with the stun belt claims, Raheem's claim that "the State made misleading, improper and unconstitutional closing arguments at both the guilt/innocence phase and sentencing phase" was not raised at trial or on direct review, and therefore was procedurally defaulted.  See Black, 336 S.E.2d at 755.  So Raheem argues now -- as he must -- that ineffective assistance of counsel provides cause to overcome the procedural default, claiming that his counsel unreasonably failed to object to the comments the district attorney made during closing arguments.  See Ledford, 975 F.3d at 1160–61.  We again conclude that the state habeas court's rejection of Raheem's ineffective assistance claim was not contrary to or an unreasonable application of Strickland, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

According to Raheem, the district attorney improperly drew on his own expertise as a prosecutor to argue to the jury that he knew that people escape from prison, and that Raheem would be a threat if he escaped.  The prosecutor invoked his own position and expertise, Raheem reasons, by repeatedly using the pronoun "I," in statements such as "I filed a notice of intent to seek the death penalty," and "I made the decision to seek the death penalty," (emphasis added).  The state habeas court found that Raheem's counsel were not deficient in failing to object to

the use of the pronoun "I," but that in any event, there was no reasonable probability that if trial counsel objected, Raheem would not have been convicted or sentenced to die. The court observed that the prosecutor was "merely making a proper assertion that the State had sought the death penalty in Petitioner's case and had given proper notice to Petitioner," and it was undisputed that the prosecutor had sought the death penalty. We cannot conclude that this determination was contrary to or an unreasonable application of clearly established law, nor that it amounted to an unreasonable determination of the facts.

The prosecutor then commented on the unconsummated escape plan found in Raheem's cell, arguing, "I'll bet you one thing, I'll bet you he hasn't given up." Raheem says the prosecutor again improperly drew on his own position and expertise by positing, "Whether he's smart enough to do it, I don't know. There have been folks that have, I know that," (emphasis added). "It has long been held that a prosecutor may argue both facts in evidence and reasonable inferences from those facts." Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985). After introducing evidence to the jury about the jail map and contraband found in Raheem's cell at trial, the prosecutor's suggestion that Raheem would try to escape was not an unreasonable one. Moreover, the brief statement that people do escape from prison, a known fact, does not impermissibly inject evidence into the record. Nor, for that matter, has the Petitioner established prejudiced. The state habeas

78

court's determination that the prosecutor's use of the "I" pronoun "clearly does not constitute error," was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

Raheem next challenges this statement from the prosecutor: "This man is just mean, ladies and gentlemen, in just plain, old country English, he's mean. He's cold-hearted.  He's cold-blooded.  And let me tell you something, he'll kill you.  And  I'm not having to guess."  The state habeas court held that the prosecutor's future dangerous argument -- as a whole -- was not improper because the prosecutor made a "reasonable deduction from the evidence in suggesting that [Raheem] would pose a future danger based on the evidence presented at the sentencing phase of trial," and that Raheem failed to establish that trial counsel were deficient or that he was prejudiced by the prosecutor's arguments.

Reviewing this determination, the district court described the prosecutor's comment as "very troubling," noting that if the jurors heard the prosecutor's comment "as articulating a specific threat to them, it was so highly improper it could potentially impermissibly taint the proceedings."  The court said, however, that "[o]n a cold record . . . it is not possible to determine with certitude whether the Prosecutor was using 'you' to mean the jurors, or using it to suggest general future dangerousness."  Applying the double deference mandated by AEDPA, the

79

district court found "some support" for the state habeas court's holding that defense counsel's performance was not deficient in failing to object. The district court also agreed with the state habeas court that Raheem was not prejudiced by the comment, especially since Crumbley addressed it in his closing argument.

We need not and do not reach the question whether defense counsel were deficient for failing to object to the prosecutor's comment, although we readily accept that it likely was erroneous for the prosecutor to tell the jury that Raheem will "kill you" and for defense counsel not to object. Nevertheless, considering the full record before the jury, we are satisfied that Raheem cannot establish that he was prejudiced by defense counsel's failure to object to the prosecutor's comment. See Dallas, 964 F.3d at 1306 ("A court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied.") (quotations omitted).

As we have seen, the state offered overwhelming evidence, including strong evidence concerning Raheem's future dangerousness. And although defense counsel did not object to the prosecutor's remark at the time it was made, as the district court noted, Crumbley addressed it in his closing argument:

> Fear is our real enemy here. It's the State's ally. That's why Mr. Floyd [the prosecutor] got up close to you and yelled at you that we know one thing for sure, and that is that he'll kill you. [Raheem] is responsible for getting all that fear started, but you can stop it. The State wants you to give in to it.

80

On this record, the state court's finding that Raheem was not prejudiced by his counsel's failure to object at the time this comment was made was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. As a result, Raheem's claims of prosecutorial misconduct remain procedurally defaulted.

## VII.

Finally, Raheem claims that it was contrary to or an unreasonable application of clearly established law for the Georgia Supreme Court to have concluded, on direct review, that the prosecutor's violation of Raheem's Fifth Amendment rights by commenting on his failure to testify was harmless beyond a reasonable doubt. We disagree.

In closing argument, the prosecutor said: "Raheem didn't take the stand but you heard his video taped statement. And I submit to you that it ain't true." Raheem's counsel immediately moved for a mistrial. The trial court denied the motion for a mistrial, explaining:

> I don't know that it is a comment on his failure to take [the stand]. I took it as how that information was coming from him. I certainly think it would have been better left unsaid. But I don't take it to be any argument, for instance, that they should hold that against him that he failed to take the stand. It was mainly pointing out to the jury the source of the evidence you were about to tell them about, it was a video tape.

81

The trial judge then declined the prosecutor's suggestion that he give a curative instruction, relying instead on the general instruction at the close of the evidence that the jury was not permitted to draw any negative inference from the defendant's failure to testify.

The Georgia Supreme Court concluded that the constitutional rule that "a prosecutor may not make any comment upon a criminal defendant's failure to testify at trial" was violated in Raheem's case.  It nevertheless found the violation harmless beyond a reasonable doubt:

> [U]pon considering the firsthand observation of the trial court that the comment in question did not appear designed to or likely to urge any negative inference, the strength of the evidence against the defendant, the charge given to the jury by the trial court, and the context in which the comment was made, this Court concludes that the violation here was harmless beyond a reasonable doubt.

Raheem, 560 S.E.2d at 685.

Raheem's claim is based on the Supreme Court ruling in Griffin v. California, 380 U.S. 609 (1965), which held that the Fifth Amendment privilege against self-incrimination "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 615.  However, in Chapman v. California, 386 U.S. 18 (1967), the Supreme Court clarified that Griffin violations are subject to harmless error review, explaining that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable

82

doubt." Id. at 24.  That is exactly what the Georgia Supreme Court did here: it found a Griffin violation, but held, under Chapman, that the violation was harmless beyond a reasonable doubt.  Raheem, 560 S.E.2d at 685.

In § 2254 proceedings, a federal court must assess the prejudicial impact of an alleged constitutional error in a state-court criminal trial under the standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), which asks whether an error had a "'substantial and injurious effect or influence'" on the jury's verdict, regardless of whether the state appellate court applied the "'harmless beyond a reasonable doubt' standard set forth in Chapman." Fry v. Pliler, 551 U.S. 112, 116, 121–22 (2007).  As the Supreme Court explained in Brecht, "collateral review is different from direct review," and, therefore, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." 507 U.S. at 633–34 (quotations omitted).

Applying Brecht here, Raheem's claim fails.  The prosecutor's comment was made in passing to explain the videotaped testimony; the evidence of Raheem's guilt was overwhelming; and the trial court clearly instructed the jury that it was barred from drawing any inference from Raheem's failure to testify.[8]

---

[8] The trial court instructed the jury this way: "[T]he defendant in a criminal case is under no duty to produce any evidence tending to prove innocence and is not required to take the stand and testify in the case.  If the defendant elects not to testify, no inference hurtful, harmful, or adverse to the defendant shall be drawn by the jury, nor shall such fact be held against the defendant in any way." Raheem, 560 S.E.2d at 685.

There is no way to conclude from the record that this passing comment, in context, had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 623.  Accordingly, Raheem cannot succeed on this claim either.

* * *

At the end of the day, we hold that the district court properly denied Raheem's § 2254 habeas petition and **AFFIRM** its judgment.